# Exhibit "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| COPE (a.k.a. CITIZENS FOR OBJECTIVE,<br>PUBLIC EDUCATION, INC.), et al., | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   Case. No. 13-CV-4119-KHV- JPO |
| KANSAS STATE BOARD OF<br>EDUCATION, et al., | )<br>)<br>) |
| Defendants. | )<br>) |

**PLAINTIFFS' RESPONSIVE BRIEF AND MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT THEREOF**

s/ *Douglas J. Patterson*
Douglas J. Patterson, Esq. (KS # 17296)
Property Law Firm, LLC
4630 W. 137th St., Suite 100
Leawood, Kansas 66224
Phone: 913-663-1300
doug@propertylawfirm.com

s/ *John H. Calvert*
John H. Calvert, Esq. (MO #20238)
Calvert Law Offices
2300 Main St., Suite 900
Kansas City, MO 64108
Phone: 816-797-2869
816-448-3703
816-448-3101 Facsimile
jcalvert@att.net

s/ *Kevin T. Snider*
Kevin T. Snider, Esq. (CALIF#170988)
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, California 95827-6600
(916) 857-6900 Telephone
(916) 857-6902 Facsimile
ksnider@pji.org

*ATTORNEYS FOR PLAINTIFFS*

## TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................................. 1

    A.    **Summary of the Complaint**.............................................................. 1

    B.    **Prayer for Relief**........................................................................ 3

    C.    **"Religion" include non-theistic belief systems**............................ 4

    D.    **The grounds for Defendant's motion are fundamentally flawed**.............. 5

II.    **Plaintiffs' do not contest the claims of immunity by the entities**.......................... 7

III.    **The Complaint alleges Article III Standing**........................................... 8

    A.    **Defendants' Standing Argument is inadequate because (1) Plaintiff's injury does not depend on whether the Policy is binding on local schools, (2) the Policy is binding and (3) it is reasonable for Plaintiffs to expect the Policy to be implemented regardless of whether it is legally binding**................................................................................ 8

    B.    **The Plaintiffs who are citizens and taxpayers suffer both economic and non-economic injury**............................................................... 18

IV.    **The Defendants' Establishment Clause arguments are inadequate because they fail to show any secular purpose or neutral effect in using deceptive methods to promote a non-theistic religious Worldview**.................................... 19

    A.    **The Argument fails to address the particular activity or message that takes the state into the religious sphere**............................................ 19

    B.    **The Policy takes children into the religious sphere when it causes them to ask and answer ultimate questions**............................................ 22

    C.    **Defendants' Purpose Prong Argument fails because (a) the Complaint alleges an endorsement of religious effects actually intended; and (b) and Defendants have not suggested any secular purpose for the effects**........................................................................................ 23

    D.    **The Complaint alleges that the Policy in fact conveys a message of endorsement and disapproval**........................................................ 31

    E.    **The Complaint alleges an excessive entanglement of the public schools with a recognized religion**............................................................ 34

    F.    **Plaintiffs' Prayer seeks to replacce non-theistic religion with objectivity, not with "their religious beliefs."** ............................................ 36

i

V.      **Defendants' Free Exercise Argument fails because the opt-out is inadequate and the Policy is not neutral**...................................................................... 39

      A.      **Plaintiffs have no effective opt out rights**.................................................... 39

      B.      **The Policy does not reflect a religously neutral policy**............................ 41

VI.     **The Policy violates the Speech Clause By Opening A Discussion of origins and then Restricting it to Only A Materialistic /Atheistic Viewpoint**................ 42

VII.    **The Complaint alleges unequal treatment and discrimination** ........................... 43

VIII.   **The Court should not dismiss John W. Bacon and Kenneth Willard**................. 44

**CONCLUSION**..................................................................................................................... 44

**Certificate of Service** ......................................................................................................... 45

**Appendix.   Discussion of Alleged Errors in the Factual Allegations of the Complaint**... A-1

## I.     INTRODUCTION

**A.     Summary of the Complaint.**   The Complaint ("C") alleges that the Framework and Standards (collectively the "Policy") adopted by the Defendants on June 11, 2013, for the education of all students in Kansas seeks to establish and endorse a non-theistic religious Worldview in the guise of science education (C ¶1,11-24,65). The Worldview is to be inculcated throughout each child's thirteen-year public school experience, beginning in Kindergarten, not only in science curriculum but also in all other school curriculum. (C ¶11-22). The Complaint alleges that the Worldview promotes all of the tenets of Religious (secular) Humanism and in particular those tenets that deny the supernatural, hold that life arises via unguided evolutionary processes and that life should be lived using reason and materialistic science. (C Exhibit A, p 3, C ¶66).

The goal of the Policy to establish a "worldview" is stated both explicitly and implicitly in numerous provisions of the Policy [P §IV.C.1.a.(1), p 24].  The Complaint further alleges that the Policy seeks to inculcate the Worldview by causing children, beginning in Kindergarten, to ask ultimate questions like the cause and nature of life and the universe - where do we come from?  (C ¶2-7, Appendix, p. 1-2) The Policy then uses a fundamental but concealed Orthodoxy called "methodological naturalism" or "scientific materialism" to guide the child to answer the questions with only materialistic/atheistic explanations.  (C ¶¶5-11, 65).

Because of the concealed use of the Orthodoxy, the Policy systematically excludes from student consideration (a) the existence of a logical and evidence-based teleological inference or alternative to the only permitted materialistic/atheistic explanations, (b) the evidence which supports that alternative, and (c) evidence which is inconsistent with the materialistic/atheistic explanation (C 65-122).  The effect is that the Child can reasonably be expected to be led over this 13 year period of indoctrination to change any worldview based on the "misconception" that

life is a creation into one that accepts materialistic/atheistic explanations of how our lives are related to the world in which we live (C-¶¶14-24, 65-86).

Because the use of the Orthodoxy is concealed, children are further led to believe that the materialistic explanations they have been led to accept are based on all the available evidence using common rules of evidence through open-minded investigation and inquiry, when in fact the explanations are to a large part driven by the concealed materialistic/atheistic preconception (C ¶97-99).

Other strategies of indoctrination alleged by the Complaint include: (a) employing the indoctrination during the years that children typically formulate their worldviews and at a time when they are not cognitively mature or sufficiently knowledgeable "to enable them to critically analyze and question any of the information presented and to reach their own informed decision about what to believe about ultimate questions fundamental to all religions" (C ¶¶14, 18); (b) excluding "from its policies regarding non-discrimination and equity, children, parents and taxpayers that embrace theistic worldviews, thereby enabling the discriminatory establishment of the non-theistic Worldview under the guise of "science" (C ¶21); (c) using a strategy that seeks to cause the core materialistic/atheistic ideas of the Worldview to be used in and "cohere" with all other curriculum and to cause students to develop "habits of mind" that accept those core ideas" (C ¶22); and (d) systematically misrepresenting and omitting information highly relevant to the questions of origins addressed by the Policy (C ¶2-20 and ¶¶84-122).

The Complaint alleges a use of secular science to conceal a program of religious indoctrination. The courts on numerous occasions have held that the state may not promote religion in the guise of science. [*Malnak v. Yogi*, 592 F.2d 197, 210, N. 45 (3d Cir. 1979 (seeking to classify transcendental meditation as science); *Smith v. Bd. of Sch. Comm'rs of Mobile County*, 655 F. Supp. 939, 982 (S.D. Ala. 1987), *rev'd on other grounds*, 827 F.2d 684

(11th Cir. 1987)] (seeking to classify "Secular Humanism" as science - see C, Exhibit A, p 2-3); *Edwards v Aguillard,* 482 U.S. 578, 599 (1987) (Powell and O'Connor concurring) ("[C]oncepts concerning God or a supreme being ..... do not shed that religiosity merely because they are presented as a philosophy or as a science.").

      **B.**    **Prayer for Relief.**  Because the goal to establish a non-theistic religious Worldview is programmed for the entire 13 years of K-12 public schooling and is designed to cohere with all other curriculum, the Plaintiffs urge the Court to enjoin the entire Policy.  A logical way to excise a systemic establishment of a religion simply does not come to mind.

      The matter is also important from a national perspective because the Policy is designed to eventually be adopted by all states in the country, with about 8 states already having adopted it. Plaintiffs believe the Complaint is timely at the inception of the establishment, rather than years after enormous resources have been expended to fully implement it throughout the Country.

      However, Plaintiff's recognize that the primary vehicle for promoting the Worldview is through standards which seek to indoctrinate a materialistic/atheistic view of "where we come from" through a materialistic teaching of origins science - science that seeks to explain the history of the universe and of life on earth.  Accordingly, instead of an injunction against the entire Policy that deals with many purely secular issues, the Plaintiffs' prayer offers an alternative that seeks the court to enjoin only the teaching of origins science in the early grades at a time that children are forming their worldviews and when they lack the cognitive capacity and knowledge necessary to make informed decisions about extremely complex issues (C ¶11-22).

      The alternative Prayer would not enjoin the teaching of origins science in high school so long as the teaching of origins science is done objectively by simply informing children of the actual state of our scientific knowledge about those issues. [C Prayer, par c.(2) (a)-(o)]

*The Alternative Prayer seeks to disclose the Orthodoxy, not teach teleology as an orthodoxy.*  Plaintiffs recognize that the Orthodoxy is in fact used in modern science, as an assumption, and has utility in many areas of science (C ¶¶78-81).  As a consequence, any teaching of origins objectively requires that the use of the assumption be adequately disclosed in origins science education that seeks to teach objectively about it.  Adequate disclosure requires that students be informed of both the use of the assumption and the effect of that use on the plausibility and reliability of the explanations provided.  This requirement is explicitly stated in the Policy as it teaches that: "Any model of a system incorporates assumptions and approximations; *the key is to be aware of what they are and how they affect the model's reliability and precision*. (Framework, p. 93)

The need for disclosure is critical because the state has taken the children into the religious sphere by asking them to develop explanations for the history of the universe and of life on earth using abductive reasoning.  Since the assumption bans the teleological alternative, students must be made aware of the ban and the evidence that supports the banned alternative in order to assess the plausibility and reliability of the materialistic/atheistic explanations required by the assumption itself.   So the discussion of teleology arises because the assumption against it has been used to develop the explanations themselves.

C.    **"Religion" includes non-theistic belief systems.**   Key to any decision in this case is the recognition that the word "religion" in the First Amendment must be defined inclusively "in the comprehensive sense in which the Constitution uses that word - [as] an aspect of human thought and action which profoundly relates the life of man to the world in which he lives." *(McGowan v. Maryland,* 366 U.S. 420, 461 (1961) (Frankfurter, J. concurring, with Harlan, J.)]  The decisions of the Supreme Court and the Tenth Circuit have embraced this

comprehensive meaning in a number of cases showing that religion includes both "theistic and non-theistic religions"  (P §III. A. 2. c., p. 12).

The Policy seeks to classify its hidden religious agenda as secular by implicitly defining religion as just theistic.  Using that definition, it uses the Orthodoxy but conceals its use.  The effect is profoundly religious as it promotes non-theistic religious views exclusively.  A Pennsylvania District Court fell into the same trap in *Kitzmiller v. Dover Area School Dist.*, 400 F. Supp. 2d 707 (M.D. Pa.,2005).  Using a theistic definition of religion that had been rejected by its peers in *Malnak v. Yogi*,  592 F.2d 197, 207-12 (3d Cir. 1979), the Court found that a logical teleological inference was religion while the Orthodoxy banning teleology and requiring only material cause explanations of origins was secular science.  Using that false dichotomy, it issued a ruling effectively forbidding any mention of teleology in the classroom and allowing only materialistic/atheistic explanations of origins, thereby implicitly promoting non-theistic religion by its decision.   The Complaint assumes that aspect of the *Kitzmiller* ruling is erroneous.[1]

**D.**     **The grounds for Defendants' motion are fundamentally flawed.**

Defendants argue that because the Policy is not binding and has not been implemented, Plaintiffs have not suffered an Establishment Clause injury in fact for purposes of standing, and there has been no religious effect under the effect prong.  This argument is fatally flawed as the injury in an Establishment Clause violation results from "a message that religion or a particular religious belief is favored or preferred. *Wallace v. Jaffree*, 472 U.S., 38, 70 (1986) (O'Connor, concurring). The message itself is the violation and it conveys the injury.  Since the Policy carries a message designed to cause the minds of theistic Plaintiffs who are students to be filled with non-theistic religious beliefs, they and their parents are in-fact injured by it, regardless of

---

[1]      *Kitzmiller v. Dover Area School Dist.*, 400 F. Supp. 2d 707, 736, 764-5 (M.D. Pa.,2005).  For an exhaustive discussion of the case and many of the issues covered by the Complaint see:  John H. Calvert, *Kitzmiller's Error: Using an exclusive rather than inclusive definition of religion*, 3 Liberty University Law Review 213-328 (Spring 2009)

5

whether it is actually implemented.  Furthermore, defendants have suggested no rational reason for anyone to believe the directive of the constitutional authority responsible for establishing standards for Kansas public schools will not be implemented.  (P § III. and §IV. C. and D.)

The allegations of the Complaint also properly allege that the effect of the Policy from the standpoint of an objective observer is to endorse non-theistic religions and particular non-theistic religious beliefs (P §IV. D., p. 31) and that because of the effects the Policy directs, it is plausible that an objective observer would conclude that those effects are actually intended (P §IV C.1.b., p. 28 )  The actual intent is clear given Defendants' responses to repeated objections to the religious effects of the Policy.  In no instance have Defendants or the Authors ever denied any of the effects complained of, rather they claimed that an illusory and ineffective statutory opt-out right was sufficient to cure the religious effects of the policy.  Thus Defendants' actions have made clear that the religious effects are intended.  (P §IV C.1.b., p. 28)

**Rule 12b-6.**  Many of Defendants' arguments seem to rely on the claim that unspecified allegations of fact in the Complaint should be ignored because they are either erroneous or conclusory.  Given this Court's interpretation of Rule 12b-6 it would seem that neither of these non-specific kinds of objections are valid.  *Semchyshyn v. Univ. of Kan*., No. 08-2627-KHV, 2009 WL 5170162, at 2 (Dec. 11, 2009).  In *Semchyshyn* the court explained that "conclusory statements of law" are not to be deemed true, but as to statements of fact "the Court assumes as true all well-pleaded factual allegations and then determines whether they plausibly give rise to an entitlement of relief." *Id.* "Plaintiff makes a facially plausible claim when he pleads factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged." *Id.* In any event, the 122 factual allegations of Plaintiffs' Complaint are in fact

exceedingly particularized and do not amount to a "formulaic recitation of the elements of the cause." *Id.* (P §IV. C, p. 23 and D, p. 31).

It is true that the Complaint does not cite all of the specific passages in the 850 page Policy that relate to each of the 122 allegations of fact, as it would extend the Complaint to one that is 300 rather than 30 pages long.  Rule 8 only requires "a short and Plain statement of the claim" - notice of the claim - not all of the details that support it, including the testimony of experts and other witnesses.  Defendants' remedy for particularity is discovery, not a 12b-6 motion to dismiss.

Although claims of factual error are required by the Rule to be ignored, Plaintiffs have included a brief Appendix that discusses key claims of error made by Defendants, which themselves are erroneous.

**II.     Plaintiffs do not contest the claims of immunity by the entities.**

Although the Eleventh Amendment only applies to "Citizens of ***another*** State, or by Citizens or Subjects of any Foreign State" and not to suits by citizens of the state, Plaintiffs, who are citizens of the state, do not choose to contest the claim of immunity by the two state entities. However, it is surprising that they would not waive that immunity in this case.   The suit will continue against the individual defendants in their official capacities and therefore the suit is essentially a suit against the state [*Hafer v. Melo*, 502 U.S. 21, 25 (1991) ]. "Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation. See Fed. Rule Civ. Proc. 25(d)(1)."  Thus the substantive issues raised by the Complaint will be decided regardless of the assertion of immunity.

### III. The Complaint alleges Article III Standing.

**A.**     **Defendants' Standing Argument is inadequate because (1) Plaintiffs' injury does not depend on whether the Policy is binding on local schools, (2) the Policy is binding and (3) it is reasonable for Plaintiffs to expect the Policy to be implemented regardless of whether it is legally binding.**

**1.**     **Establishment Clause injury arises from a government message of endorsement regardless of whether the message is "binding."**

The principal error of the Defendants' argument is that it is based on a misconception of the nature of the injury effected by an Establishment Clause violation. Establishment Clause injury arises from a "message of endorsement" and the Complaint alleges that Defendants delivered such a "message" when they adopted the Policy. Defendants' argument assumes that no message occurs when Defendants adopted the Policy, it is only after its implementation that a message of endorsement arises. However, it is clear the Defendants' adoption of the Policy did convey a message, which the Complaint alleges endorses a non-theistic religious Worldview. Accordingly, even if the message is only an encouragement it is an endorsement. All that is needed is an "aura of school authorization and approval." *Bell v. Little Axe ISD,* 766 F.2d 1391, 1405 (10th Cir 1985).

As acknowledged by Defendants Memorandum (D p. 24), in an Establishment Clause violation the injury arises from an "endorsement," or an action by government that "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred." *Cnty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 593 (1989). The injury of such a "message" by government is that it classifies "nonadherents" as "outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members." *Wallace*, 472 U.S. at, 69. This "encroaches upon the individual's decision about whether and how to worship," or what to worship. "In the marketplace of ideas, the government has vast resources and special status....Allowing government to be a potential

8

mouthpiece for competing religious ideas risks the sort of division that might easily spill over into suppression of rival beliefs." *McCreary County v. ACLU*, 545 U.S. 844, 883 (2005) (O'Connor concurring).

An Establishment Clause violation can result in both economic and non-economic harm or injury.  Economic harm can arise from being required to fund the government activity *Foremaster v. City of St. George,* 882 F.2d 1485, 1488 (10th Cir 1989) or by being required to take steps to avoid it. *O'Connor v. Washburn University***,** 416 F.3d 1216, 1222-3 (10th Cir 2005).

Non-economic injury includes a variety of injuries such as personal "offense" to the message that may arise from an infringement of "non-economic religious values" or "religious beliefs," [*Anderson v. Salt Lake City Corp*. 475 F.2d 29, 31 (10th Cir 1973)], "visual impact[s]" or spoken messages that "offend" or "intimidate," such as the observation of an offensive monument (*Id.),* or city logo that carries a Christian symbol that has "threatening connotations," to a "Jew," "Lebanese Moslem or Northern Irish Protestant" or "Native American" [*Robinson v. City of Edmond*, 68 F.3d 1226, 1230 (10th Cir, 1995)],  having to listen to an appeal to the Supernatural during the invocation of a high school graduation ceremony [*Lee v. Weisman*, 505 U.S. 577, 583 (1992)], encouraging both "meditation and voluntary prayer," [*Wallace,* 472 U.S., *Id.*], observing a coach "take a knee" with his football team [*Borden v. School Dist of East Brunswick*, *523 F.3d 153* (3rd Cir, 2008)], being aware of a breach by the state of its trust through an intention to indoctrinate public school children in a particular religious belief (*Edwards,* 482 U.S. at 583-4), excluding one of two competing ideas regarding the origin of man (*Epperson v. Arkansas,* 393 U.S. 97, 109 (1968),  proselytization or indoctrination [*Mitchell v. Helms*, 530 U.S. 793, 844-5 (2000) (O'Connor and Breyer concurring), and "fear" [Otero v. State Election Bd. of Oklahoma, 975 F.2d 738, 740 (10th Cir 1992); ("fear of psychic ..punishment")].

Thus, in the context of the Establishment Clause the vehicle or instrument that causes the injury is the message itself.   Furthermore, the "context" within which the message is delivered is critical to both the meaning of the message and its impact and injury on any particular recipient. Critical to the issue of injury is the (a) nature, authority and identity of the speaker , (b) the nature, content and context of the message of endorsement and (c) the targets of the message - the persons who receive or observe the message and its effect on them.

For purposes of the motion to Dismiss the context includes the allegations of the Complaint which are deemed to be true and which are to be viewed in the light most favorable to the Plaintiffs' claim.

### 2.    The Message of Endorsement Alleged by the Complaint

The following is a discussion of the message of religious endorsement alleged by the Complaint relative to these factors.

### a.    The Speaker.

**The Speaker.**  The message at issue was delivered by the Defendants by their adoption of the Policy on June 11, 2013 (C ¶1).  As explained by the Kansas Supreme Court in *State ex rel. Miller v. Bd. of Educ. of Unified Sch. Dist. No. 398*, 212 Kan. 482, 489, 511 P.2d 705, 711 (1973), the State Board has the authority to "supervise the public schools and to adopt regulations for that purpose." In this respect KSA §72-7513  states that the "state board shall" "[a] adopt and maintain standards, criteria, guidelines or rules and regulations" for "[c]ourses of study and curriculum" and "textbooks and other educational materials." These define what all students in Kansas are to "know and be able to do in specific content areas." Kan. Admin. Regs. § 91-31(d).  Furthermore, accredited schools in the State of Kansas "shall teach the subjects and areas of instruction adopted by the state board of education." K.S.A. § 72-1127(a).  Indeed, in order to receive and maintain accreditation, local schools boards must adhere to the Defendants' guidelines and standards. K.S.A. § 72-7513(a)(3).   The requirements of the

Policy to establish "what students should know" as described in the Complaint demonstrates the tractability of Defendants' conduct to Plaintiffs' injury.

*Miller* is significant because in that case a local board challenged the authority of the State Board to cause it to implement a rule adopted by the State Board pursuant to KSA §72-7513. The court upheld the State Board rule in a manner such that Justice Fromme, dissenting, viewed the holding as one that "effectively removed any vestige of authority from local school boards." *Miller*, *Id.* at 493. Regardless of the how one defines the precise meaning of "supervise," it is clear that the Board does have both the duty and the authority to adopt the Policy and to supervise local schools in implementing the exceedingly detailed standards articulated in its 450 pages. Thus, the Policy is in fact "binding" on the local districts.

Kansas Statutes also provide that the Defendants Commissioner of Education and the Department of Education will be subject to the supervision of the Board. K.S.A. §72-7601 and K.S.A. §72-7701. Thus the Policy adopted by the Board is also a direction to the Commissioner of Education to implement it.

> **b.** **The Content of the Message.** The Complaint alleges that the adoption of the Policy has the "purpose" (C ¶7) and effect of causing the Kansas public schools supervised by the Defendants "to establish and endorse a non-theistic religious worldview" in "all students" by causing them to ask ultimate religious questions like "what is the cause and nature of life and the universe - 'Where do we come from?'" (C ¶2) and then leading them "to answer the questions with only materialistic/atheistic answers" (C ¶5) and accept them as "valid," (C ¶6) through the "concealed use of "a materialistic/atheistic" "Orthodoxy (defined in ¶¶ 8 and 9) and a variety of other deceptive methods."(C ¶5)

Details of the message are summarized above (P §I. A. p. 1).

    **c.**   **The Message endorses a non-theistic religion.** The Complaint further alleges that the particular non-theistic religious beliefs the Policy seeks to promote, establish and inculcate in the minds of students include the key tenets of Religious (secular) Humanism, an atheistic religion. (C ¶¶66, 77, Exhibit A at 2). The allegation that atheism and the tenets of Religious Humanism amount to particular religious beliefs the state may not endorse is a legal conclusion. However, ample law supports the conclusion.

    "Religion - in the comprehensive sense in which the Constitution uses that word - is an aspect of human thought and action which profoundly relates the life of man to the world in which he lives." *(McGowan v. Maryland,* 366 U.S. 420, 461 (1961) (Frankfurter, J. concurring, with Harlan, J.) The ideas that there is no God or supernatural that has intervened in the natural world and that life is not a creation, but rather is just an occurrence arising from unguided evolutionary processes, do profoundly relate life to the world in which it is lived. Thus, these ideas are religious in the comprehensive sense in which the Constitution uses that word. As a consequence, the Supreme Court and most other Circuit courts have held that religion includes both "theistic and non-theistic religions," [*Lee v. Weisman,* 505 U.S. at 617 (Souter, Stevens and O'Connor concurring)], such that "[t]he Settled law" is that "the Clause applies 'to each of us, be he Jew or Agnostic, Christian or Atheist, Buddhist or Freethinker.'" *Id* at 611. Religious (secular) Humanism, a non-theistic religion, (Exhibit A, p 2) has been held to be a religion by numerous courts, [*Fellowship of Humanity v. County of Alameda* at 315 P.2d 394, 406 (Cal. Ct. App. 1957); *Washington Ethical Society,* DC Cir 1957: 249 F.2d 127 (D.C. Cir 1957); *Smith v. Bd. of Sch. Comm'rs of Mobile County*, 655 F. Supp. 939 (S.D. Ala. 1987), *rev'd on other grounds,* 827 F.2d 684 (11th Cir. 1987); and *Strayhorn,* Tex App. 2003: 110 S.W. 3d 458 (Tex. App. 2003)] and has been recognized as a religion by the Supreme Court explicitly in *Torcaso v. Watson,* 367 U.S. 488, 495 and Note 11 (1961) and implicitly in *U.S. v. Seeger,* 380 U.S. 163,

166 (1965), where the Court adopted a test of religion identical to the one articulated by Judge

Peters in *Fellowship of Humanity*.  Atheism has been held to be a religion for Free Exercise

purposes in *Torcaso, Id.* and for Establishment Clause purposes in *Lee,* 505 U.S. at 592, 611, and

in *Kaufman v. McCaughtry,* 419 F.3d 678, 682 (7th Cir 2005).

The Tenth Circuit has "adopted" the broad definition of religion in *US. v. Meyers*, 95

F.3d 1475, 1483 (10th Cir. 1996) and has "assumed" that Atheism is a religion as Defendants'

brief mentions (D p. 28).

> **3**.  **The Complaint alleges that Plaintiff Parents and Children are directly, actually and imminently and not conjecturally or hypothetically injured by the Message.**

>> **a.   Plaintiffs are the object of the religious Message.**  Defendants standing

argument is based primarily on *Lujan v. Defenders of Wildlife*, an environmental regulation case

which is factually dissimilar to the Complaint in two important respects.  First, the complaint in

*Lujan* did not allege a violation that arises due to a message by defendants endorsing a particular

religious belief in violation of the Establishment Clause.  Second, the Plaintiffs in Lujan were not

the object of the alleged unlawful government activity.  In Lujan the court pointed out that:

> "standing depends considerably upon whether the plaintiff is himself ***an object of the action (or forgone action) at issue.*** If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife* ,504 U.S. 555, 561-2 (1992)

The governmental action alleged by the Complaint to be illegal is aimed directly at

Plaintiffs who are children in public schools, their parents and members of COPE who fall in the

same category.  They are the "objects" of the "action at issue," because the standards establish

the substantive content of the information the minds of students in Kansas public schools are to

be filled with and come to "understand," and "know and be able to do."

The injury is actual and not conjectural or hypothetical as it occurred on June 11, 2013, after an officer and a member of COPE pleaded with the Board to not adopt the Policy on May 14 and June 11, and on other occasions when other Plaintiffs learned about the action prior to the September 26, 2013 date of filing of their Complaint. (C ¶¶ 58-60)

    b.  **Injury to the Parents.** Perhaps the key injury to Plaintiffs is the fact that the adoption of the Policy amounts to a breach of trust the State owes to Plaintiffs who are parents.  The nature of the Trust is explained in *Edwards,* 482 U.S. at 583-4.

    The Court explained that because Plaintiffs are compelled to submit their children to the state for their public education, they do so under a "trust."  The Trust is "condition[ed]" "on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Id.*

    The Trust is necessary and essential because:  (a) "**Students** in such institutions **are impressionable;**" because (b) "**their attendance is involuntary,**" because (c) "**[t]he State exerts great authority and coercive power through mandatory attendance requirements**," and (d) "because of" (i) "the **students' emulation of teachers as role models** "and [(ii)] the **children's susceptibility to peer pressure**."  The *Edwards* Court concluded that because of these factors there is "no activity of the State [where] it is more vital to keep out divisive forces than in its schools..." *Id.*   As a consequence and as a means of enforcing the Trust the Court indicated that it "has been required often to invalidate statutes which advance religion in public elementary and secondary schools." *Id.*

    Defendants committed the breach of trust on June 11, 2013, by causing the State to adopt a Policy that would direct the public schools in the state to purposely use their classrooms to advance religious views that do conflict with the private beliefs of the Plaintiffs as articulated in the Complaint.   This breach of trust amounts to a direct and personal injury in fact to the

Plaintiffs who are parents as well as to the Plaintiffs who are children, as it is their minds that are to be filled with the offensive message.

Given the authority of Defendants, the Plaintiffs' expectation that the program will be implemented and made effective if not enjoined or altered is reasonable and not speculative. (P §III.A.2.a., p. 10)

When Plaintiffs asked the defendants to not adopt the Policy on two occasions in May and June of 2013, Defendants' response was that the religious message would be implemented and that if Plaintiffs didn't like it they could avoid it through the use of an illusory and ineffective opt-out policy. (P §V. A, p. 39).   A request by a member of the Board to delay implementation to allow for further study of the objections was summarily rejected in favor of recklessly proceeding without engaging in that due diligence. (C ¶62).  The Policy is in fact a "blueprint" for educating every student in the entire U.S. (C ¶56).

The alleged harm is not an isolated harm that may occur for a fleeting moment as one attends a graduation ceremony, or walks past a monument in a park, or touches a coin that might bear an offensive religious message.  Rather, the Complaint alleges the establishment of a pervasive Worldview designed to cohere with every aspect of a child's public school experience for 13 years. (C ¶¶14 - 22).

The Complaint alleges that the injury caused by the establishment of a program designed to indoctrinate children to accept a materialistic/atheistic view about the cause and nature of life and of the universe is that beliefs about those matters necessarily influence ancillary beliefs about how life should be "lived ethically and morally." (C ¶4)

From an emotional standpoint the plight of the Parents is absolutely frightening, as there is nothing they can do to avoid the injury or to alleviate their fear.  They cannot move to another school district as the Policy applies to all districts.  It is also questionable as to whether they can

avoid the message by moving out of the state, as the Policy is designed to be adopted by all states for all students in the U.S.  A state that has not adopted the Policy today, may adopt it tomorrow if their Complaint is ignored by the courts.  Furthermore, in many cases Plaintiffs are simply tied to farms and other occupations which preclude a move.   So they are trapped.

Thus, most of the immediate non-economic injury to Plaintiffs who are parents is the emotional fear and distress occasioned by the Policy.  They also will experience significant economic injury in developing effective strategies to avoid the religious message, through incurring the cost of home schooling or private schooling.

c.      **The Injury to the Children.** Because the children cannot think or speak for themselves, their injuries must be presumed.  Since the Parents that are plaintiffs must speak for the child, they must presume that the child will be injured by a program of religious indoctrination alleged in the Complaint.

In this respect, the primary Injury to the Plaintiffs that are children is the reasonable threat that the Program will "indoctrinate them into accepting a non-theistic religious Worldview" "that is inconsistent with their existing theistic religious beliefs." (C ¶124)

The Tenth Circuit has recognized that the threat of indoctrination is real because primary and secondary school children are impressionable and lack the ability to make their own informed and reasoned decisions.  The Tenth Circuit has agreed with an expert that "a child between the ages of 6 and 11 does not have the cognitive ability to 'appreciate the difference between his point of view and that of somebody else, [and that it is] as if he simply assimilates and takes, unthinkingly, what other people have taught to him.' ... [as]  Children at this age are particularly influenced by authority figures, including teachers. .... [and that] [a]s children move into their adolescent years, ages 11-15, peer influence takes on increasing weight. ..[and] [i]t is

not until the age of 18 that the child fully develops the ability to make decisions independent of authority figures and peers.'" *Bell,* 766 F.2d at 1404-5, Note 11.

Another significant injury is the fear that the Policy will "imbue them with a religious belief that is inconsistent with the beliefs their parents have sought to instill in them" and eventually lead them "to lose respect for their parents who hold views inconsistent with the Orthodoxy" and the non-theistic views advanced by the Policy. (C ¶124.c. and f.).

### 4. The injuries alleged are directly caused by and traceable to Defendants' actions and will be redressed by the relief requested.

As explained above the injuries in Fact to Plaintiffs are all caused by the actions of Defendants and not by any third party.  If the Defendants had acted as requested by Plaintiffs at the meetings on May 14 and June 11, 2013 the trust would not have been breached, they would not now have to worry about what their children will be taught and they would not now need to make plans for alternative forms of education for their children.

It should also be obvious that a granting of their prayers in the Complaint would redress the injuries.   Accordingly the Court should recognize the standing of COPE and Plaintiffs who are parents and students to assert the claims herein alleged.

### 5. Defendants' objections fail because they are erroneous and implausible.

Defendants argue that Plaintiffs' injury "hinges on a decision by a local board to" both "adopt," and then "implement the standards." (D p. 18) The conclusion is erroneous as the state has already adopted the standards. The law provides for the state, not the local schools to adopt standards for what Kansas children are to "know and be able to do." [P §III.A.2.a., p. 10]

The injuries of the Plaintiffs derive from the messages contained in the Policy and the response of the Defendants to their complaints about those messages.

The Defendants' objections implicitly depend on the assumption that the local districts will not implement the standards that Defendants have adopted.  However, there is no factual

basis for that assumption in the facts alleged in the Complaint, which are deemed to be true, or in the 850 pages of the Policy.  In fact the premise of non-implementation is actually counter-intuitive and inconsistent with the entire program and the actions taken by the Board.

The cases relied upon by Defendants to support their counter-intuitive theory of the case are simply not applicable.  *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26 (1976) is not an Establishment Clause case.  Plaintiffs were indigents seeking to enjoin an IRS revenue ruling to third-party hospitals that offer only emergency room service to indigents.

Defendants' assertions that the injuries alleged by Plaintiffs throughout the Complaint, and particularly in paragraphs 23, 24, 25 and 123-126, as explained in more detail above, are not caused by Defendants are based entirely on unsupported conjecture.   Furthermore, it is obvious that the relief requested by Plaintiffs will redress their grievances.

**B.**     **The Plaintiffs who are citizens and taxpayers suffer both economic and non-economic injury.**

The Complaint alleges that Plaintiffs David and Victoria Prather "are residents of Lake Quivira, Kansas, who pay ***property taxes which are used in part to fund public schools*** in Kansas, and who object to the use of such funds by the State of Kansas for the establishment and promotion of a non-theistic religious ***worldview through its implementation of the F&S."*** (C ¶43)  They specifically allege that they suffer economic harm because it causes them to "fund the state's endorsement of the tenets of non-theistic religions which conflict with their theistic beliefs" (C ¶123).

It is clear from the Policy that significant funding will be necessary for the implementation of the Policy, particularly with respect to the teacher training and development that it will necessitate. (Framework 241- 276).  The Policy also expects the funding to come from state revenues, particular from local property taxes as is recognized by the Framework at 244.

18

The Prathers' claim of standing is based on the fact that "any use of public funds to promote religious doctrines violates the Establishment Clause*." Bowen v. Kendrick*, 487 U.S. 589, 623 (1988). (O'Connor, concurring). The direct injury in fact to the Prathers is the message by the State that it has established a program to promote a religious worldview that will necessitate the use of additional public funds, and that it will expect to obtain those funds in part from amounts the Prathers pay for state income and local property taxes (C ¶¶43 and 123).

Under these circumstances the Prathers' claim fits within the *Flast* exception as they have shown "a logical link between [their taxpayer] status and the type of legislative enactment attacked." The link is the fact that the Policy specifically contemplates the need of funding from tax dollars to fully implement the establishment. There is also (2) "a nexus between that status and the precise nature of the constitutional infringement alleged," *Flast v. Cohen***, 392 U.S. 83, 102, (1968), because, as explained by *Bowen, Id.* (O'Connor concurring), tax dollars may not be used to fund an Establishment Clause violation. Hence the Establishment Clause operates as a specific limit on the taxing and spending power of the Government. *Flast, Id* at 103-4.

In addition, because the parent and student plaintiffs have standing, there is no need to consider the standing of the Prathers. *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc*, 547 US 47, 52 n. 2 (2006) and *Campbell v. Buckley*, 203 F3rd 738, 740 n. 1 (10th Cir 2000).

For the foregoing reasons, the Complaint alleges injury in fact by all Plaintiffs that is caused by the actions of Defendants and that is redressable by a grant of the relief requested.

**IV.   The Defendants' Establishment Clause arguments are inadequate because they fail to show any secular purpose or neutral effect in using deceptive methods to promote a non-theistic religious Worldview.**

**A.   The Argument fails to address the particular activity or message that takes the state into the religious sphere.**

In *Gillette v. U.S.* the Supreme Court described the Establishment Clause as standing for "the proposition that when government activities *touch on the religious sphere*, they must be

secular in purpose, evenhanded in operation, and neutral in primary impact." *Gillette v. U.S.,* 401 U.S. 437, 450 (1971) (emphasis added)

The primary defect in Defendants' argument is that it fails to focus on the particular activity or message of the Policy alleged in the Complaint that takes the state into the religious sphere and that is claimed to convey a proscribed endorsement of a particular religious belief.

The Defendants' argument rests on the assumption that because parts of the Policy have valid secular purposes, then the alleged activity that otherwise takes the state into the religious sphere can be legally ignored.  Essentially the Defendants argue that since it is secular for the state to teach science, then it may use that secular program to otherwise endorse and establish a non-theistic religious Worldview.  The argument is that this activity is permissible as that activity does not "predominate" within that entire secular "context."   This reasoning would permit a state to teach "creation science," instead of materialistic/atheistic origins science, so long as it was incorporated in an otherwise secular Policy.

But that is not the law. "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides*." McCreary County* 545 U.S. at 860. "'*Lemon*'s 'purpose' requirement aims at preventing [government] from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters'." *Id,* citing Corporation *of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U.S. 327, 335 (1987).  Thus, government may not use secular content to justify the delivery of a religious message. *Bell v.* 766 F.2d at 1402 (holding a secular accommodation policy could not be used to mask a religious purpose). *McCreary Id.*  (holding that adding secular content to a display of the Ten Commandments, would not neutralize context showing a predominant intent to deliver a religious message).

Establishment Clause analysis requires one to first determine whether a particular government activity "touches on the religious sphere," (*Gillette Id.*) or "speaks on a religious subject." *Wallace* 472 U.S. at 60-1; *Lynch,* 465 U.S. at 673, 691. When it does, then "one of the questions that we must ask is 'whether the government intends to convey a message of endorsement or disapproval of religion,'" (*Wallace, Id.)* "or a particular religious belief" (*Wallace, Id.* at 70 ) or "practice." *Lynch*, Id. at 690.  Another question is "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid." *Lynch, Id.*

The need to focus on the particular activity that takes the state into the religious sphere is reflected in *Wallace,* where the insertion of voluntary prayer into a secular statute permitting voluntary meditation was deemed offensive.  In *Epperson* the activity was the teaching of origins science and then excluding one of two competing viewpoints. *Epperson*, 393 U.S. at 109. "The Establishment Clause case that comes most readily to mind as involving 'underinclusion' is *Epperson v. Arkansas*. There the State prohibited the teaching of evolutionist theory but 'did not seek to excise from the curricula of its schools and universities all discussion of the origin of man.'" *Welsh v. United States*, 398 U.S. 333, 357-58, 362 (1970) (Harlan J. concurring in the result).   Similarly, in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 8-9 (1989) the Court struck down a statute that had a secular purpose in exempting non-profits from certain taxes because it was underinclusive with respect to the scope of non-profit organizations entitled to a tax exemption.  In so holding the Court stated that it "' must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders'" *Texas Monthly, Inc, Id* at 17 (quoting Harlan J, in *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970).  The Orthodoxy is a classic religious gerrymander when applied irrefutably to origins science.

21

In *Roberts v. Madigan,* 921 F.2d 1047, 1057 (10th Cir 1990) the activity was a teacher's silent reading from a Bible during class time prescribed for an otherwise secular silent reading program from any book.  That particular activity of the teacher was found to have the primary effect of communicating a message of endorsement." *Id* at 1059.

**B.    The Policy takes children into the religious sphere when it causes them to ask and answer ultimate questions.**

**1.    The question of origins takes one into the religious sphere.**  The Complaint states the obvious that questions about origins regarding the cause and nature of life and the universe take the discussion into the religious sphere. (C ¶¶3 and 4) The Tenth Circuit definition of religion recognizes that religions address "ultimate questions." *United States v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996).  The cases about origins are legion, beginning with the Scopes trial in Tennessee.  Thus science education about the cause and nature of life and the universe has both a religious and scientific effect.  So it is the activity of the state that causes students to confront and answer those questions that takes the state into the religious sphere. The question then becomes, is the method used by the state to handle that issue "secular in purpose, evenhanded in operation, and neutral in primary impact?"  *Gillette, Id.*

**2.    The Complaint alleges that the Policy takes the school into the religious sphere.**   As explained, the activity of the state that takes it into the religious sphere is its effort to establish a non-theistic religious Worldview through the use of a concealed materialistic/atheistic Orthodoxy in origins science education.  (P §I.A. p. 1, Alternative Prayer). Seeking to establish a non-theistic worldview is religious (P § III.A.2. p. 10). Thus, it is clear that religion includes competing theistic and non-theistic beliefs about the cause and nature of the universe and of life - where do we come from? (C ¶¶71-77)  The Complaint also alleges with particularity that "[t]wo principal competing evidence-based explanations have existed for

22

thousands of years with respect to the origin of the universe, of life and of the diversity of life, one materialistic and the other teleological." (C ¶¶71-4)  It then alleges that "[t]he two competing ideas about the nature of the natural world generate competing religious beliefs," with one supporting but not entailing theistic beliefs and the other supporting but not entailing non-theistic religious beliefs. (C ¶¶75-77).  It then alleges that the Policy uses but conceals the use of the Orthodoxy and that through that concealed use and a variety of other deceptive methods it seeks to advance the non-theistic religious worldview.  (C ¶¶78- 87)   As a consequence the Complaint identifies an activity of the state that takes it into the religious sphere and a further strategy designed to promote only the non-theistic religious view.   No secular purpose or neutral effect comes to mind for this planned activity.

### C. Defendants' Purpose Prong Argument fails because (a) the Complaint alleges an endorsement of religious effects actually intended; and (b) Defendants have not suggested any secular purpose for the effects.

#### 1. The Complaint alleges religious effects that are actually intended and actions which confirm the inference.

As previously explained, when government activity touches on the religious sphere a question "we must ask is 'whether the government intends to convey a message of endorsement or disapproval of religion,'" (*Wallace* 472 US at 60-1) "or a particular religious belief" (*Id at 70*) or "practice." *Lynch* 465 U.S. at 690.

The Complaint generally alleges the Policy's actual intent to endorse a particular religious belief (C ¶¶1, 7, 13, 17, 24, and 95), but it also alleges particular facts from which an objective observer may infer an actual intent to endorse a particular religious belief.   Two categories of fact lead to that inference.  One category consists of the alleged effects of the policy and the fact that logically one may infer the intent or purpose of an action based on the effects of the action.

The second category consists of the response of the Defendants and the authors of the Policy to very specific complaints that the Policy would have the proscribed religious effects outlined in the Complaint.   As explained below those responses objectively show that the effects are in fact intended.

      **a.**       **Inferring actual religious purpose from the religious effects of the Policy.** Since the purpose or intent of an action is often revealed in its effects, the effects themselves should first be examined to determine the purpose of the message.  For example in *Wallace*, *Id.* a religious purpose was inferred from the effect of an insertion of "voluntary prayer" to a statute allowing for meditation.

Similarly, by analyzing the effects alleged in the Complaint from the Policy, one may infer that the purpose of designing a Policy that will produce those effects is the same as the effects themselves.  The following discusses effects of the Policy that seek to promote a "Worldview" that promotes all the tenets of Religious (Secular) Humanism.

      **(1)**       **Religious effect of seeking to establish a worldview.** First the goal of the policy to establish a "worldview" has a religious effect because a worldview is a belief system that "profoundly relates the life of man to the world in which he lives," which is the *McGowan* definition of religion in the "comprehensive sense in which the Constitution uses that word." (C ¶3). *McGowan,* 366 U.S. at 461.  This definition mirrors the definition of "Weltanschauung" or "world view" described in Webster's: "a conception of the course of events in and of the purpose of the world as a whole forming a philosophical view or apprehension of the universe... a philosophy of life: IDEOLOGY...3: the cosmologic conception of society and its institutions held by its members." *Webster's Unabridged 2014* definition of Weltanschauung.

As explained below, the Policy both explicitly and implicitly states as a goal the

establishment of a "worldview" in all students.  The endorsement of this religious goal by the state then clearly has a religious effect.

Oddly, the establishment of a "worldview" would not seem to have a scientific effect or a scientific purpose, as science is an activity that eschews dogmas and doctrines. Instead of seeking to establish a worldview its goal is to investigate and establish reliable "knowledge," not opinions about how our lives should be related to the world in which we live.   This was explained by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 590 (1993) where the Court held that the goal of science is to produce valid or "reliable" and "trustworthy" explanations rather than pre-ordained ones. *Id.* at 589-90, 597.  According to *Daubert*, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.  This goal would seem inconsistent with the Goal of the Framework to establish a "worldview" that provides only materialistic/atheistic explanations even if they are "counter-intuitive," "against common sense," "patently absurd," and nothing more than "unsubstantiated just-so stories."  (C ¶9)

The fact that the Policy does seek to establish a worldview is explained in the Policy both explicitly and implicitly:

> "***To capture the vision in the Framework, students should be assessed on the extent to which they have achieved a coherent scientific worldview*** by recognizing similarities among core ideas in science or engineering that may at first seem very different, but are united through crosscutting concepts." NGSS Appendix G.  Crosscutting Concepts, 4 (April, 2013).

> "The Framework identifies seven crosscutting concepts that bridge disciplinary boundaries, uniting core ideas throughout the fields of science and engineering. ***Their purpose is to help students deepen their understanding of the disciplinary core ideas (pp. 2 and 8), and develop a coherent and scientifically based view of the world (p. 83.)*** *Id. at* 1.

> "***We*** detail eight practices we consider essential for learning science and engineering in grades k-12.... Participation in these practices helps students ***form an understanding of the disciplinary ideas of science .....and embeds it more deeply into their worldview."*** Framework, 41-2.

> Students are expected to be able to "develop.. and demonstrate...understanding of an ***accepted scientific viewpoint."*** Framework, 48.

Although the worldview is described as a "scientific" worldview, because the Policy uses

the Orthodoxy, the worldview actually allows only materialistic/atheistic explanations. (C ¶8-9).

The worldview is therefore one which promotes a materialistic/atheistic worldview as described

by Dr. Lewontin (C ¶9)

The Policy also implicitly promotes that worldview as evidenced by many other

provisions in the Policy and other effects as described below.

(**2**)     **Religious effect of using the Orthodoxy.**  The religious effect of the

Orthodoxy is candidly explained by Dr. Lewontin.  Its effect is to permit only

materialistic/atheistic explanations that will ensure that the "Divine foot," never enters the "door"

of the school room (C ¶9).  It also excludes any teleological alternative to the materialistic

explanations whether or not evidence based (C-¶8 and 65-86).  Thus the Orthodoxy has the effect

of banning logical evidence-based ideas that support theistic beliefs and allowing only for those

ideas that support non-theistic religious beliefs.   Thus the Policy is systemically underinclusive.

(P §IV. A., p. 19) and *Welsh*, 398 U.S. at 357-8, and 362.

(**3**)     **Religious effect of concealing the Use of the Orthodoxy.**  Another effect

alleged by the Complaint is that the Orthodoxy is not only used, but its use is concealed (C ¶¶11-

12), even though the Policy recognizes the need to fully understand both the use and effect of use

of assumptions in science. (P §I.B., p. 4).  The effect of a concealed use of a fundamentally

important assumption is to mislead.   In the context of the policy the misleading effect is to cause

belief in materialistic explanations and disbelief in the alternatives, an effect that promotes non-

theistic religious beliefs while undermining competing theistic beliefs.  The fact of concealment

itself evidences an actual intent to promote the misleading religious effect.

(**4**)     **Religious effect of seeking to have children ask and answer religious**

**questions with only materialistic/atheistic explanations.** An effect of the Policy is that it seeks

to have impressionable children ask and answer ultimate or worldview questions and then causes

26

them to answer the questions only with "scientific" or "materialistic/atheistic" explanations allowed by the Orthodoxy. (C ¶¶2-7, 65-86)

        **(5)**    **Religious effect of misrepresenting the nature of the investigation.** Not only is the Orthodoxy concealed, the children are also told that the materialistic/atheistic explanations provided are based on an open-minded, honest investigation per common rules of evidence, when in fact that is not the case (C ¶12).  Because of the use of the Orthodoxy the investigation employees tunnel vision (C ¶82). The effect of the deception is to lead the child to believe that the non-theistic explanations are true, when in many cases they are actually, as explained by Dr. Lewontin, "counter-intuitive" "just-so stories."  (C ¶9, 99)

        **(6)**    **Religious effect of the other "General Methods of Indoctrination."** All of the listed general methods of indoctrination (C ¶87-122) may logically be expected to have the effect of deceptively promoting non-theistic religious beliefs.  These include both material misrepresentations and omissions, which are each described with particularity.

        An analogy would be to that of a jury trial, where the jury is only informed of the evidence that supports one party's case, but not the other, and where the Jury is not informed that a competing view even exists.   Even a grand jury proceeding is more informative because the Jurors actually know there is another side.  In this case the children are led to believe that there is no other side.

        **(7)**    **Religious effect indoctrinating impressionable children.**   The Complaint alleges that the materialistic/atheistic views are to be indoctrinated at a time when the children lack the cognitive capacity and knowledge necessary to question or challenge the non-theistic view promoted and during the years they typically form their worldview from their parents, and that the effect of this approach is to cause them to develop a worldview that is non-theistic (C ¶14-18).  Since the Tenth Circuit has recognized that under these circumstances

children are likely to simply accept what they are told by their teachers, one may expect that the religious effect will occur. (C ¶14-19 and P  III.A.3.c, p. 16).

(**8**)   **Religious effect of excluding equal treatment and policies of non-discrimination based on religion.**  By withholding policies of equal treatment and non-discrimination based on religion, the Policy has the effect of sanctioning discrimination in favor of non-theists and disfavoring theists. (C-¶21)

(**9**)   **Religious effect of seeking to incorporate the worldview in all other curriculum.** The effect of incorporating the non-theistic Worldview in all curricula has the religious effect of immersing the worldview in all students.  The religious effect is far more comprehensive and subtle and enables the goal of seeking to make the worldview a habit of mind in all citizens of the Country. (C ¶22)

It is reasonable for the objective observer to conclude from this litany of effects that their primary effect is a message that the state intends to endorse non-theistic religion.  Just as one might infer that the effect of a teacher's obvious silent reading only from his Bible will have the primary effect of sending a message of endorsement to the children. (*Roberts, Id.*)

Given that effect, one may also objectively infer from this litany of effects that the effect is intended and not incidental or accidental.   As a consequence the Complaint, on that basis alone, plausibly pleads an actual intent to endorse a particular religious belief.

**b.**   **The response to Plaintiffs' objections show the effects are intended.**

The Defendants and the Authors of the Policy were advised of all the above referenced religious and non-scientific effects of the Policy on four separate occasions over a period of a year.  Exhibit A, which essentially mirrors the Complaint in all major respects, was issued to the Authors of the Policy on June 1, 2012 when the Standards were first published for public

comment.   None of the complaints were addressed in the next draft of the Standards in early

January, 2013 and COPE was not contacted to discuss them in any way.

Because of that lack of response, COPE, in its January 29, 2013, analysis of the revised

draft made clear to the Authors that the "second draft" "is not responsive to any of the comments

we provided regarding the first draft..a copy of [which] is posted on our website at....", and that

this "lack of response to the serious Constitutional, scientific, and educational issues raised by

our letter is both surprising and puzzling." (C Exhibit B). The letter then sets forth a summary of

the points made in the June 1 letter and a number of additional detailed comments.  It ends with a

reminder that the Authors had not responded and that the issues were constitutionally important.

In April the final Standards were issued (C ¶57) without responding to any of the

religious effects detailed in COPE's two letters.

Due to the second non-response, COPE representatives furnished copies of Exhibits A

and B to Defendants on May 14, 2013 and "urged the Kansas Board to reject the F&S for the

reasons stated in the COPE Analyses and invited representatives of the Board to engage in a

detailed discussion of concerns that the F&S infringe on the religious rights of parents, children

and taxpayers." (C ¶59).  Having received no response, a member of COPE made a similar plea

to the Defendants on June 11, 2013 (C ¶59).  Again Defendants failed to respond, except for

Defendant Willard.  Defendant Willard read to his Co-defendants a lengthy letter of his own

objecting to the Policy for reasons similar to those expressed in the COPE letter.  (C ¶59-63)

Defendant Willard even "urged the Board to delay action on the F&S until it had investigated the

assertions in the COPE analyses," which proposal was summarily rejected. (C ¶61-2)

Rather than discuss the religious effects detailed in the letters, some of the Defendants

who voted for the Policy deemed the religious issues to be resolved by the state policy that

permits parents to opt their children out of activities having religious effects (D p. 36).   Thus,

the Defendants specifically recognized the religious effects but chose to promote those effects regardless of the objections.

Thus, it is reasonable for the objective observer to conclude that the objections to the religious effects expressed in the letters could be ignored, not because they were invalid, but because Defendants erroneously thought they could be avoided by the opt out policy.  As explained under the Plaintiffs' argument to the Free Exercise Claim, the opt out is not practically feasible given the stealth and systemic nature of its religious effects (P §V.A.1., p. 39).

From the foregoing it is reasonable for the objective observer to infer that the religions effects of the Policy are actually intended.

**2    Defendants' Arguments do not address the message of endorsement alleged by the Complaint.**    Defendants first argue that although the action of the Board carried no statement of purpose, it may be gleaned from the content of the Policy and another document not referenced in the Complaint or included in the Policy - the "R&R," which Plaintiffs have never seen because of the moratorium on discovery. (D p. 29-30)  Given this is a motion to dismiss, Defendants may not resort to information not incorporated in the Complaint, and therefore any in the R&R may not be considered by the Court.

Nevertheless, even if the R&R is considered as alleged, it and other documents mentioned by Defendants merely state platitudes one would expect in a Policy designed to promote a hidden religious agenda.

Furthermore, Defendants' argument regarding the purpose of adopting a policy that has the alleged religious effects is essentially not to deny the effects but to endorse them on the grounds that Plaintiffs can legally avoid those effects because the Policy also has secular purposes or because Defendants erroneously conclude that the effects are not religious.

It is true that many of the goals of the Policy are secular, but what is lacking is a showing of any secular purposes for the religious effects explained above.  No secular purpose for endorsing those effects has ever been suggested.  Simply wrapping a concealed religious agenda in an otherwise legitimate cloak of secularity does not remove the need to show a secular purpose for those aspects of the Policy which seek to inculcate a non-theistic religious worldview (*Wallace*, *Id*., *McCreary County*, *Id., Bell, Id., Roberts, Id.* etc.)

### D.     The Complaint alleges that the Policy in fact conveys a message of endorsement and disapproval.

As previously explained, an Establishment Clause analysis requires one to first determine whether a particular government activity "touches on the religious sphere" or "speaks on a religious subject." (§IV. A, p. 19). When it does, then "one of the questions" is "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to [this] question should render the challenged practice invalid." *Lynch,* 465 U.S.  at 690 .

As explained under Section IV. C.  the Policy conveys numerous messages that convey the State's endorsement of a particular non-theistic religious worldview.  Due to these non-neutral religious effects one may objectively infer an actual intent.  Since the inference arises from the non-neutral effects themselves, then one must conclude that the practice itself violates the neutral effect prong of the endorsement test.

**Defendants' arguments are inadequate.**     In support of its motion, Defendants' effect prong argument relies on the unsupported claim that one may not know the effect of the Policy as it has yet to be implemented. For the Defendants "the primary effect of the Framework and Standards is yet unknown."  But that argument does not address the effect of the message conveyed by the adoption of the Policy.   The question is what is the reasonably likely effect of

31

an intended implementation, not what its actual future effect as that cannot be known.  As explained under the purpose analysis above, that message requires public schools to inculcate a non-theistic religious worldview through a variety of deceptive mechanisms and methods, all of which have reasonably likely non-neutral religious effects and no educational effect that actually seeks to objectively inform.  What is at issue is the effect of that message.  A violation occurs whether or not the message is actually implemented, as the message itself amounts to an endorsement by the state of a non-neutral religious goal.  This issue is covered in detail in Plaintiffs' standing analysis.

Defendants also argue that the message alleged by the Complaint is in error as the allegations in the Complaint "do not even resemble the actual standards."  This is an issue of fact to be resolved against the Defendants on a motion to dismiss.  Furthermore, the allegations of the Complaint are extremely particularized and not conclusory.   Perhaps more importantly, one would not expect a hidden religious agenda to appear from the face of the Policy.

The inadequacy of Defendants' assertions of error is also evident from the face of its brief as the claims of error are themselves erroneous. These inadequacies are detailed in Appendix A hereto.

Defendants cite cases where textbooks or reading series may contain incidental effects that may harmonize with a particular religious view and that such effects are not actionable when they have not been shown to actually reflect a religious purpose.  The Complaint alleges a far different message.  The Policy incorporates a central goal to establish a worldview in all children in the entire country beginning in Kindergarten and to cause that worldview to be incorporated in all public school curricula.  The Complaint does not allege that the Policy's endorsement of the materialistic/atheistic worldview is merely incidental to an otherwise secular message.  Rather it

alleges that a secular message is being used to hide the establishment of a comprehensive religious worldview.  As explained above the effect is not incidental and is intended.

The conclusion that the effect is materialistic/atheistic is supported by the allegations regarding the nature of the Orthodoxy, the fact of its use, and the fact that the use is concealed. Thus the Complaint alleges a stealth form of indoctrination which few will actually recognize. The Courts have made clear that a stealth message can not be justified by surrounding it in a secular garb [*Roberts*, 921 F.2d, at 1057 (silent reading of Bible by teacher during secular reading time); *Bell,* 766 F.2d at 1402 (secular policy used to accommodate religious program); *McCreary County*, 545 U.S. at 860 (Ten Commandments surrounded by secular displays; *Wallace*, 472 U.S. at 60-1 (statute calling for secular meditation as well as voluntary prayer). The Complaint alleges that the Policy delivers its religious message in the guise of science (C 21) through a series of deceptive strategies and methods. (C 10-22)

Defendants rely on the holding of the Eleventh Circuit that certain passages and omissions in certain history, social studies and home economics books did not have the primary effect of endorsing Secular Humanism  [*Smith v. Bd. of Sch. Comm'rs of Mobile County*, 655 F. Supp. 939 (S.D. Ala. 1987), *rev'd on other grounds*, 827 F.2d 684 (11th Cir. 1987)].   *Smith* is important because the holding of the lower court that Religious (secular) Humanism is a religion, based on an extensive and detailed analysis, was not reversed.  Rather, on appeal that conclusion was assumed to be valid (*Smith* at 827 F.3d at 689).   Also, as explained above, the *Smith* facts are distinguishable from the Policy.  *Smith* did not deal with a comprehensive program designed to use science to indoctrinate all children for thirteen years in a non-theistic religious worldview through the concealed use of an Orthodoxy that permits only materialistic/atheistic answers to ultimate questions.  The books at issue in *Smith* were social, not science texts that dealt with origins science.  Finally, in *Smith* all of the parties agreed that none of the books had the purpose

33

of promoting Religious (secular) Humanism or had the effect of entangling the state with religion, so the only issue for the court was the primary effect of books which were already deemed by all parties to be secular in purpose (*Smith* at 827 F.3d at 690).

Defendants oddly suggest that promotion of the atheistic religious worldview by excluding the theistic view is actually necessary to avoid an endorsement of religion.  The logic of promoting one religious view to avoid the possibility of promoting another is not readily apparent to Plaintiffs.   Under this twisted logic, Defendants contend that children should not be told that "the cause and nature of life and the universe deal with deeply religious issues that can dramatically affect the student's religious belief and religious worldview."  Nor should they be told that "science has not provided definitive answers to the questions,.." (D p. 33)

Defendants' position is odd as it does not claim that these issues are not religious, nor do they claim that science has in fact answered the questions.   In effect the Defendants assert that the public schools must promote an exclusively materialistic/atheistic message in a deceptive manner to comply with the Establishment Clause.  This discriminatory concept is expressly forbidden by the holding in *Lee v. Weisman* that the state may not discriminate between "theistic and non-theistic religion" or between "believers" (theists) and "nonbelievers" (atheists and agnostics). *Lee v. Weisman*, 505 U.S. 577, 611 and 617 (1992).  Under  Defendants' twisted logic the state may ban any mention of God during a one minute invocation at a high school graduation ceremony at the end of 13 years of public education, after promoting the "core idea" that there is no god throughout the students' prior 13 year educational experience.

**E.**      **The Complaint alleges an excessive entanglement of the public schools with a recognized religion.**

The Complaint, including Exhibit A in particular, alleges that the Policy is not only entangled with a recognized religion - Religious (secular) Humanism, but it seeks to promote all

of the tenets of that non-theistic religion.  One of the tenets of Religious Humanism is that life should be led though the use of human reason and naturalistic science.  Other tenets include the tenet that life arises via unguided evolutionary processes, that there is no supernatural, and that life ends on death.  The Manifestos referenced in Exhibit A also promote environmentalism and social justice, which the Policy also promotes (C Exhibit B, p 4-5; and Framework at 278).  Thus the Complaint alleges a clear entanglement between the Policy and recognized religion.

An entanglement is also alleged because the Policy seeks to cause children in the institutions of public education to ask and answer ultimate religious questions with prescribed materialistic/atheistic answers.  Thus, the curriculum is not confined to only secular or mundane questions.  As explained previously, if the Policy eschewed any discussion of the history of the universe, the history of earth and the history of life on earth, then the religious sphere might be avoided. *Epperson,* 393 U.S. at 109.  But that is not the case.  The Policy takes the child into the very heart and core of the religious sphere.

The entangling effect was explained by the Supreme Court: "Arkansas' law cannot be defended as an act of religious neutrality. Arkansas did not seek to excise from the curricula of its schools and universities all discussion of the origin of man." *Epperson*, *Id.*.  Research also indicates that explanations regarding the origin of the universe and the origin of life trigger automatic religious responses. Jesse Preston and Nicholas Epley, *Science and God: An Automatic Opposition Between Ultimate Explanations*, J. of Experimental Soc. Psychology 45, 238-241 (2008) (research finding that scientific explanations of origins subconsciously reduce belief in God as the strength of the explanation increases). Thus, the very discussion of origins by the state entangles it with religion.  So, is the Policy's entanglement excessive?

The Complaint does allege an excessive entanglement in two respects. One is the concealed use of the Orthodoxy and the other is the fact that the Policy seeks to promote that

worldview beginning with five-year olds, with the aim of inculcating that view for the entire thirteen years they spend in the public school classroom.

The word excessive implies a subjective concept with respect to which reasonable minds may differ.  Arguably, an entanglement will not be excessive if the state provides an objective presentation designed to *inform* rather than indoctrinate the impressionable young mind with respect to a particular religious perspective. *Malnak,* 592 F.2d at 215; *Epperson*, 393 U.S. at 106. However, it appears that use by the state of a concealed orthodoxy like the Orthodoxy to "proscribe" "from the body of knowledge a particular segment" [teleology and inadequacies of natural/material/mechanistic cause theory] because "it is deemed to conflict with a particular religious doctrine [there is no supernatural and life arises via unguided evolutionary processes]" (*Epperson*, *Id* at 103), would clearly amount to an excessive entanglement with religion.

Thus the concealed Orthodoxy actually renders the state's entanglement with religion excessive, as it causes the state to suppress relevant information to promote one of competing religious perspectives.   As explained by Justice Harlan this formula reflects a classic example of "underinclusion." *Welsh,* 398 U.S. at 357-58.

### F.   Plaintiffs' Prayer seeks to replace non-theistic religion with objectivity, not with "their religious beliefs."

Defendants assert:

"At least part of Plaintiffs' problem with the Standards is that they do not incorporate Plaintiffs' religious beliefs. See, e.g., Complaint (Doc. #1) ¶¶ 110-114, 118, 120, 122; see also, e.g., id. *at 30 (seeking alternative relief requiring teaching of Plaintiffs' religious beliefs regarding "origins science")."* (D p. 35)

In *Roberts v. Madigan*, the Court stated:

"Here, we are particularly mindful, as was the district court, that there is a "'difference between teaching ***about*** religion, which is acceptable, and teaching religion, which is not.'" *Roberts,* 921 F2d. at 1055.

Defendants' statement about the Alternative Prayer reflects a profound misunderstanding of the difference between teaching religion and teaching objectively ***about*** a religious subject. We suggest their misunderstanding is engendered by an implicit desire to define religion narrowly as just theistic. When religion is confined to belief in God then everything else, including atheism and other non-theistic beliefs are "conflated" into the secular. The public schools may then promote all views about anything so long as God is not mentioned. In this mode non-theistic religious beliefs may be promoted to the hilt dressed up in a white lab coat.

Defendants make the odd argument that the Complaint conflates the "secular" with non-theistic religion. (D p. 28). That is not the case. Rather the Policy and Defendants' argument conflate non-theistic religion with the secular so as to provide non-theistic religion with a secular status.

Given the required inclusive definition of religion, then it should be apparent that a materialistic/atheistic view of where we come from is just as religious as an evidence based teleological inference that contradicts that view. Accordingly, it should be clear that the Alternative Prayer seeks to insert educational and scientific ***objectivity*** into an otherwise dogmatic non-theistic religious explanation of where we come from. Accordingly, the Prayer does not seek to import theistic religion into the curriculum, rather it seeks to objectively inform about an otherwise concealed non-theistic religious Orthodoxy that is the foundation of modern evolutionary theory.

***The legal necessity of explaining the fact that "we don't know."*** Subparagraph c.2.(d) of the Alternate Prayer urges teachers to not present one of competing explanations of an origins event as valid or as the best explanation, but rather they should seek to merely objectively explain the actual state of our scientific knowledge concerning those events. This actually reflects a legal as well as pedagogical necessity. Under the law the state may not take a position

on the validity of any religious tenet.  As explained in *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 728-29 (1871), "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Similarly, in *US. v. Ballard,* 322 U.S. 78, 87 (1944), the Court held that the state may not take a position on the validity of a religious doctrine.  The idea that life arises via an unguided evolutionary process is a doctrine or tenet of Religious (secular) Humanism.  Accordingly, a public school may not treat that view as "valid," and encourage the idea that a disbelief in it is invalid.

There is also a pedagogical necessity in that we in fact do not know the answers to the ultimate origins questions (C ¶10, 111). Given the fact that the questions are unanswered, and because the state may not legally give an answer, the Alternative Prayer provides a formula for teaching the subject objectively and thereby keeping the minds of the children open rather than closed as to these profound religious mysteries.  The Alternative Prayer actually models the way the Policy describes the scientific enterprise as open-minded, honest and driven by all the available evidence using common rules of evidence.

***The Alternative Prayer does not insert teleology into the curriculum.***  As explained in the introduction (P §I.B, p. 3), the Alternative Prayer does not seek to insert teleology into the curriculum.  Rather in teaching "the actual state of our scientific knowledge" it seeks to inform students about the "conventional" use of an Orthodoxy that bans that "idea" and by affirmatively teaching students that living systems are not designed (C ¶100-102).  The Alternative Prayer does nothing more than what the Policy calls for - the adequate disclosure of assumptions. Under the Policy not only must assumptions be disclosed, the effects of the assumption on the reliability of the explanation must be described (P §I.B, p. 3).

Teleology is an evidence based inference that has existed for thousands of years and that formerly drove the scientific enterprise (C ¶71-78).  It has been recognized as the primary challenge to evolutionary theory:

> "[A]s Francisco Ayala discusses in this issue of PNAS (19), the challenge for evolutionary biologists is to explain how seemingly well designed features of organism, where the fit of function to biological structure and organization often seems superb, is achieved without a sentient Designer. Adam S. Wilkins, *Between "Design" and "Bricolage": Genetic Networks, Levels of Selection, and Adaptive Evolution*, PNAS, *supra* note 53, at 8591 (May 15, 2007)

It is true that Plaintiffs allege their particular religious beliefs so that they may show the injury required to have standing to complain and about how the Policy abridges their free exercise, speech and equal protection rights. However, the Complaint contains no request or suggestion that their particular beliefs be taught or that the state embrace any religious orthodoxies they may hold.  Neither the Complaint nor the Alternative Prayer in any way suggests that any tenet of a religious text be included in the curriculum, including any version of "creation science" that seeks to promote a literal interpretation of the Biblical Genesis account.

## V.     Defendants' Free Exercise Argument fails because the opt-out is inadequate and the Policy is not neutral.

**A.     Plaintiffs have no effective opt out rights.**   Defendants rely on a case in which a high school Jewish sophomore auditioned for and was accepted in an elective a capella choir that necessarily engages in the singing of religious music in both religious and non-religious venues (*Bauchman v. W. High Sch.*, 132 F.3d 542, 546 (10th Cir. 1997).  Because the instructor provided Ms. Bauchman the right to opt out of performances involving religious songs offensive to her Jewish religion with the understanding that the election of the opt out option would not adversely affect her grade, the Court found she was not "coerced," into participation in a program elective that was religiously offensive to her.

Defendants claim that the Bauchman case and a Kansas Statute allowing for an opt out right frustrates Plaintiffs Free Exercise claim due to the lack of coercion.  The statute entitles a

parent to opt the child out of an "activity which is contrary to the religious teaching of the child" upon written request of the parent "stating the reason for the request."  (D p. 36)  However, the Statute does not guarantee that the opt-out will not adversely affect the student's grade.

The idea that Plaintiffs have a legal right to opt out of a concealed program that is designed to continue for the entire thirteen year public education of the child and to "cohere with all other curriculum" would seem on its face grandly illusory.  To take advantage of that right the parent would have to opt the child out of all public education, which the very same statue requires.  Such an action would obviously affect the child's grade as the Child would not be taught the material the standards require that students be tested on.   The Parent would also have to incur the cost of a substitute educational program.

Furthermore, the Policy effectively conceals the indoctrination and in any event makes no provision for requiring teachers to notify parents as to when the indoctrination provided by the Policy is to occur. Its subtle and systemic nature indicates it is quite likely a child will not even recognize when the indoctrination may occur.   Even if the opt-out were allowed whenever the non-theistic religious worldview is promoted, the child would have to forego the benefits of the education the child would have received if the subject were just taught objectively and in a religiously neutral manner.

Thus, the facts of this case are significantly different than those mentioned in *Bauchman* or contemplated by the opt out provision. As a practical matter, Plaintiffs have no effective way to avoid submitting their children to the thirteen year program of indoctrination alleged in the Complaint.  The same statute cited by the Defendants actually compels their attendance.  Hence, actual coercion is present.

Although *Lee v. Weisman*, did not involve a Free Exercise claim, the court found that students are indirectly coerced when they must decide to forego a graduation ceremony to avoid

40

one minute of a ceremonial invocation.  *Lee,* 505 U.S. at 587-8. Certainly, coercion is direct where the student must forego all the benefit of a public education to avoid the offensive religious message the Policy commands.

> **B.      The Policy does not reflect a religiously neutral policy.**

As alleged in the Complaint, the Policy does not comprise a religiously neutral policy that would qualify for the exception to the requirement for strict scrutiny.  The lack of neutrality is actually apparent on its face.  This is reflected in its Policy explained in NGSS, *Appendix D - "All Standards, All Students.",* p. 2 (April 2013).  Although the policy supposedly seeks "equal treatment for all" (Framework, p. 278), it actually excludes "children, parents and taxpayers that embrace theistic worldviews, thereby enabling the discriminatory establishment of the non-theistic Worldview under the guise of "science." (C ¶21)

Thus religious discrimination is implicitly permitted, because the equal treatment and non-discrimination policies are only applied with respect to race, ethnicity, socio-economic status, gender and a variety of other categories other than religion. *NGSS, Appendix D, Id.*   It specifically omits from a requirement for equal, neutral and non-discriminatory treatment those holding diverse religious beliefs.  This enables the Policy to indoctrinate children to change their theistic "misconceptions" for the materialistic/atheistic concepts promoted by the Policy. (C ¶16)

Since the Policy is not neutral, and since the allegations of the Complaint show no compelling state interest in promoting a non-theistic religious worldview in violation of the Establishment Clause and any effort to tailor it to achieve a compelling state interest, the Complaint properly alleges a violation of Plaintiffs' free exercise rights.  *Empl. Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990)) and  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993).

Defendants also assert that the Policy is not based on religious animus.  This is inconsistent with the allegations of the Complaint that shows not only implicit religious discrimination but a specific intent to change the theistic "misconceptions" of students (C 15-19). The Complaint alleges religious animus that is both explicit and implicit.

In *Empl. Div v. Smith, Id.*at 882, the Court indicated that a strict scrutiny analysis is appropriate when the Free Exercise right is coupled with another constitutional right such as the right of parents to direct the religious educaton of their children or a concurrent violation of their rights under the Establishment Clause [*E.E.O.C. v. Catholic University of America* 83 F.3d 455, 467 (D.C. Cir. 1996)]. Given the violations of both parental and Establishment Clause rights in the Complaint, there is no basis for dismissing Plaintiffs' Free Exercise Claims.

### VI.    The Policy violates the Speech Clause By Opening A Discussion of origins and then Restricting it to Only A Materialistic /Atheistic Viewpoint

"Generally, the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector*, 515 U.S. 819, 828 (1995).  However, where the government is the speaker it may regulate the content of speech when the government occupies a non-public forum. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 US 788, 800 (1985). Normally a school class room is deemed to be a non-public forum. *Citizens for a Responsible Curriculum, et.al. v. Montgomery County Public Schools*, p. 19, (Civil Action No. AW - 05-1194 (D. MD. May 5, 2005). However, even in a non-public forum the state may not engage in viewpoint discrimination. Viewpoint discrimination occurs where there is no ban on a general subject matter [such as origins] but only on one or more of the competing perspectives. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Rosenberger v. Rector*, 515 U.S. at 832.

Generally, the speech clause is one that militates against state sponsored ideologies or orthodoxies.  When a controversial subject is opened, but the state allows only one perspective, then the state effectively is promoting an orthodoxy or ideology.   This idea was expressed in *Board of Education. v. Pico* where the Court held that the Speech Clause reflects a right of students to receive ideas. *Board of Education. v. Pico*, 457 U.S. 853, 867-8 (1982) (J. Brennan, Concurring). "Our Constitution does not permit the official suppression of ideas." *Id* at 871.  In that case the court held that school officials violated the speech clause by causing the school library to remove certain books because those in authority did not agree with the ideas expressed by the books in question.

More particularly, in *Epperson,* 393 U.S. at 104 the Court articulated this idea in voiding a statute that suppressed one of multiple perspectives on origins: "'The law knows no heresy and is committed to the support of no dogma, the establishment of no sect.... the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.'"

Since the Complaint alleges the standards are being published for use by schools in a limited public forum, it is not permissible for the state to encourage districts within the state to open a science class to a discussion of origins that is scientifically and religiously controversial and then limit that discussion to only those scientific views that favor materialistic/atheistic explanations.  The Complaint therefore alleges the elements of a valid Speech Clause claim.

## VII.    The Complaint alleges unequal treatment and discrimination.

As previously explained, the Complaint alleges that the Policy was adopted after very specific assertions that the Policy would discriminate against the Plaintiffs.  The only reply provided to Plaintiffs was that they could assert facially inadequate opt out rights if they did not like the discriminatory content.  The elements of religious discrimination are detailed in two

lengthy letters provided to each of the Defendants prior to their taking their discriminatory action.

In addition, as explained above the policy explicitly discriminates against theists by excluding them from its policy of equal treatment based on religion. (P §V.B., p. 41)  This allows the Policy to discriminate against theists and in favor of non-theists.

**VIII.   The Court should not dismiss John W. Bacon and Kenneth Willard.**

In order to facilitate this Court's jurisdiction and provide an adequate reach for an equitable remedy, the Complaint names all ten members sitting on the State Board in their official capacities.   Defendants Bacon and Willard do not hold their seats in perpetuity. Pursuant to Fed. Rules Civ. P. 25(d), when an officer "dies, resigns or otherwise ceases to hold office," the "successor is automatically substituted as a party."  In reality, each of the ten District seats serves as a necessary party.  It makes little difference how individual Board members voted relative to the Policy.   Thus, dismissal of Bacon and Willard is improper.

**CONCLUSION**

For the foregoing reasons the Defendants' motion should be overruled.

Respectfully submitted,

s/ *Douglas J. Patterson*
Douglas J. Patterson, Esq. (KS # 17296)
Kellie K. Warren, Esq. (KS #16733)
Michelle W. Burns, Esq. (KS #21167)
Property Law Firm, LLC
4630 W. 137th St., Suite 100
Leawood, Kansas 66224
Phone: 913-663-1300
doug@propertylawfirm.com
kellie@propertylawfirm.com
michelle@propertylawfirm.com

s/ *John H. Calvert*
John H. Calvert, Esq. (MO #20238)
Calvert Law Offices
2300 Main St., Suite 900
Kansas City, MO 64108
Phone: 816-797-2869
816-448-3703
816-448-3101 Facsimile
jcalvert@att.net

s/ *Kevin T. Snider*
Kevin T. Snider, Esq. (CALIF#170988)
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, California 95827-6600
(916) 857-6900 Telephone
(916) 857-6902 Facsimile
ksnider@pji.org

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

This is to certify that on this 27th day of January, 2014, the above and foregoing document was electronically filed with the Clerk of the Court by using the CM/ECF system with notice electronically sent to:

Jeffrey A. Chanay       jeff.chanay@ksag.org
Cheryl L. Whelan        cwhelan@ksde.org
Stephen O. Phillips     steve.phillips@ksag.org

*ATTORNEYS FOR DEFENDANTS*

s/ *Douglas J. Patterson*
Douglas J. Patterson

45

**Appendix**

(to Plaintiffs' Response and Memorandum in Opposition to Motion to Dismiss)

**Discussion of Alleged Errors in the Factual Allegations of the Complaint**

Defendants argue in various instances that the allegations of the complaint are in error. Plaintiffs believe the claims of error are irrelevant as the Defendants must take as true those allegations whether or not they believe them to be in error. Thus, Plaintiffs have no need to respond to claims of error. However, Plaintiffs believe that a discussion of some of the claimed errors may be helpful to the court for background purposes. Accordingly, this Appendix discusses some of the claims of error that are made by Defendants that are themselves errors.

1.      **Error 1: The "phrase "where do we come from" is not in the "Framework or Standards."** Defendants argue that the Policy does not seek to cause the children to ask and answer ultimate questions like "where do we come from?" According to the Defendants, the "phrase "where do we come from" is not in the "Framework or Standards." (D 10).

In fact the statement is in the Framework where it seeks to explain how the curriculum is to be built around that question and the children's natural curiosity which Defendants admit:

> "As a strategy for building on prior interest, the disciplinary core idea identified here are described not only with an eye toward the knowledge that students bring with them to school, but also toward the kinds of question they are likely to pose themselves at different ages. Such questions as ***"Where do we come from?,"*** "Why is the sky blue?", and "What is the smallest piece of matter?", are fundamental hooks that engage young people. ***Framing a curriculum around such sets of questions helps to communicate relevance and salience to this audience.***" Framework, 28.

2.      **Error 2. The Policy does not seek to cause the children to ask and answer ultimate questions.**

In connection with the denial that the standards do not have students ask where they come from, Defendants also contend that the standards do not cause children to ask and answer ultimate questions and they "do not address philosophical or religious questions." (D 10-11) As an illustration of how the standards omit to do that Defendants take us to a portion of a middle school standard which does precisely that (D 11):

> "MS- LS4-1. Analyze and interpret data for patterns in the fossil ***record that document the existence, diversity, extinction, and change of life forms throughout the history of life on Earth*** under the assumption that natural laws operate today as in the past."[1]

Notice that the standard does not deal with a mundane question. Rather this standard requires children to "analyze and interpret" patterns occurring in the natural world that "document" the "history of life on earth," including the "existence of life," the fact that it is diverse, that it ends on death and that it has changed through history. Thus the standard calls for children to ask questions about the "history of life on earth," what caused it and what is its nature. Standard cross-cutting concepts lead children to ask "cause and effect questions," about naturally existing patterns. Although these are legitimate scientific questions they also take the

---

[1]      The stated assumption seems to be in error, as the principle of uniformatarianism states the assumption that we generally assume that the laws that operate now also operated in the same way in the past. The stated assumption is the reverse of that, and makes no logical sense. The assumption should be that "natural laws operate in the past as they do today."

child into the religious sphere when asked to apply them to the "history of life on earth," as the answers will define their cosmology - their religious worldview about how their lives are related to the world in which they live.

After causing sixth graders to look at the patterns presented, they are then lead to apply "scientific ideas" to construct an explanation for the cause of an event. What the child is not told is that the only "scientific ideas" that are available for those explanations are those that are permitted by the Orthodoxy.  Hence the explanation that the child is led to develop is one that is materialistic/atheistic:

> MS- LS4-2. **Apply scientific [materialistic/atheistic] ideas to *construct an explanation for the anatomical similarities and differences among modern organisms* and between modern and fossil organisms to infer evolutionary relationships. (D 11, bracketed material and emphasis added).**

Although many of the patterns intuitively lead one to consider the inference that something like an eye, which operates like a human made camera, may itself be designed, that inference is not a permissible "idea," given the Orthodoxy.  One may only "infer" using "scientific [materialistic/atheistic] ideas."

Other standards then reveal the materialistic "idea" to be used to craft an "explanation." The "scientific idea" is that random mutation and other stochastic processes combined with natural selection explain all the similarities and differences one observes in both modern and ancient organisms.  Thus the standard leads the student to conclude that life arises via an unguided evolutionary processes, consistent with a core tenet of the Humanist Manifestos:

> "L**S3.B: Variation of Traits**  In sexually reproducing organisms, each parent contributes half of the genes acquired (***at random***) by the offspring. Individuals have two of each chromosome and hence two alleles of each gene, one acquired from each parent. These versions may be identical or may differ from each other. (MS-LS3-2)
> "***In addition to variations that arise from sexual reproduction, genetic information can be altered because of mutations.*** Though rare, mutations may result in changes to the
> structure and function of proteins. Some changes are beneficial, others harmful, and some neutral to the organism. (MS-LS3-1)  (NGSS, Topical Arrangements, p 53 (June 2013).

Because of the concealed use of the orthodoxy, the standards make no provision to explain to children that the answer is ordained in advance by the orthodoxy and is a product of "tunnel vision," as alleged in the complaint, and that significant evidence exists which casts doubt on the adequacy of random mutation and other stochastic processes to account for the origin of life itself - the first chapter of the history of life on earth - and of all of the subsequent biocomplexity, and that the omitted evidence also supports an inference to a teleological explanation.  However, because of the Orthodoxy, the standards make no provision to objectively inform students of the competing evidence and ideas.  The student is also not advised that the observed similarities and differences are also consistent with the disallowed teleological competing idea that is classified by the orthodoxy as not "scientific."  (C 110- 121).

Another problem with the example in isolation is that it omits to mention that this teaching begins at age 5 in Kindergarten and continues for 13 years with young impressionable minds that have no recourse but to accept the materialistic/atheistic answers provided.   The entire issue of origins science is perhaps the most speculative and complex issue that science deals with.  Yet, the Policy ignores the complexity because the task is not really to inform, but rather is to imbue.

**3.      Error 3.  There is no "Orthodoxy in the Framework or Standards, both of which encourage discussion and analysis." (D-41-2)**

The Defendant's also disingenuously deny the use by the Policy of the Orthodoxy: "There is no 'Orthodoxy' in the Framework or Standards, both of which encourage discussion and analysis." (D 41-2).

Defendant's argument that the Policy does not explicitly reveal the orthodoxy is actually consistent with allegations of the complaint that the use of the Orthodoxy is concealed. (C 11, 99).  The provision Defendants refer to as inviting "questions" and then explanations driven by the evidence is actually misleading when applied to the issue of origins.  The list of eight practices cited by Defendants include: "6. Constructing explanations (for science) and designing solutions for (for engineering)."

This is misleading when applied to origins because the orthodoxy only allows the construction of *materialistic/atheistic* explanations about where we come from.  See para 8 and 9 of the Complaint.  Thus instead of seeking an inference to the best of competing explanations, the Policy deceptively leads students to construct an inference to the best "materialistic/atheistic" explanation, not an inference to the "best explanation," based on all the available evidence.

Defendant's claim that the Policy does not actually use the Orthodoxy is odd because (a) it is clear that modern science uses it and (b) because there are many examples of its actual use in the Policy.

The actual use by science is evidenced by the decision in the *Kitzmller* case:

> "While ***supernatural explanations may be important and have merit***, they are not part of science...... This self-imposed ***convention*** of science, which limits inquiry to testable, ***natural explanations*** about the natural world, is referred to by philosophers as "***methodological naturalism***" and is sometimes known as the scientific method." *Kitzmiller v. Dover Area School District,* 400 F.Supp.2d 707, 735 (MD. PA, 2005)[2]

Nonetheless, Defendants' implicit denial of the use of the Orthodoxy by modern science is odd, particularly in light of their knowledge that it has been incorporated explicitly in prior versions of Kansas Science Standards.

The concealed use of the Orthodoxy in the Policy is not couched in terms of "scientific materialism" or "methodological naturalism."  Rather the Policy uses the label of "Mechanism" rather than "materialism" or "naturalism."   Thus, the Policy limits explanations of the cause of an event in the natural world to only those caused by a "mechanism," or as explained by Dr. Lewontin, by a "material cause." (C ¶9).

This is extremely deceptive, because, to the uninitiated, the idea to look for a mechanism seems eminently reasonable, as a mechanism colloquially does not necessarily exclude a mind or an intelligent cause.   However, in the terms of philosophy and the way the concept is used in the

---

[2]       Actually the "scientific method," which oddly is rejected by the Policy (Framework p. 78), does not include the presupposition of methodological naturalism, rather it excludes it. The "scientific method:…[consists of] the principles and procedures used in the systematic pursuit of intersubjectively accessible knowledge and involving as necessary conditions the recognition and formulation of a problem, the collection of data through observation and *if possible* experiment, the formulation of hypotheses, and the testing and confirmation of the hypotheses formulated." Webster's Unabridged 2014.

Policy, "Mechanism" is "a philosophical doctrine that holds that natural processes and especially the processes of life are mechanically determined and capable of complete explanation by the laws of physics and chemistry — compare TELEOLOGY, VITALISM." Webster's Unabridged 2014. Thus, Mechanism and Materialism are functionally synonymous. The philosophy excludes the supernatural and teleology and provides the foundation for atheism and other non-theistic religions.

As explained in paragraphs 79 - 86 of the Complaint the Orthodoxy has scientific utility in some areas of science, but produces negative effects when used irrefutably in historical origins science.

The use of the Orthodoxy with reference to mechanistic rather than "material causes" as used by Lewontin (C ¶9) is reflected in the following apparently innocuous descriptions:

"2.      Cause and effect:  Mechanism and explanation.  Events have causes, sometimes simple, sometimes multifaceted.  *A major activity* of science is investigating and *explaining causal relationships* and the *mechanism* by which they are mediated." Framework 84,

and:

"In this way, *the physical sciences - physics and chemistry - underlie all natural and human created phenomena,* although other kinds of information transfers, such as those facilitated by the genetic code or communicated between organisms, may also be critical to understanding their behavior. An overarching goal for learning in the physical sciences, therefore, is to help students see that there are *mechanisms of cause and effect in all systems and processes that can be understood through a common set of physical and chemical principles."* Framework 103.

The concealed use of the preconception is evident.  NGSS Appendix H, page 5 shows a progression that causes five-year olds to begin to "search for cause and effect relationships to explain natural events" such as the cause of life.  Beginning in the third grade the child learns that "mechanisms" explain the cause of those events:  "Science explanations describe the mechanisms for natural events."  The problem is the child does not know or realize that there is embedded in this simple statement that seems quite reasonable a very deep and overarching materialistic/atheistic orthodoxy that will lead the child to eventually accept that everything in the natural world is explained by material mechanisms, not by any intelligent cause.  The presupposition is to be used for thirteen years but never disclosed.  The Complaint also explains how the subtle concept is embedded in the standards through the use of a false dichotomy that living systems and structures are not "designed," as are human made systems (C ¶¶101-105).

These are just examples, many others abound in the Policy.

Clearly the effect of the indoctrination is to lead the child to believe that life is just the product of a mechanism or material cause and that his intuition that it is due to an intelligent cause happens to be wrong and that his religion is built on a faulty premise that life is a creation, not an occurrence.  Of course, the message is not that explicit.  A subtle and continuous use of the hidden preconception over thirteen years can be expected to be far more effective.

If in fact the Orthodoxy were true, then its hidden use would not have the "effect" of the state causing children to embrace a particular religious belief.  However, the Complaint alleges a litany of facts which show the Orthodoxy is actually a faith-based assumption that is the foundation for non-theistic religious beliefs, particularly those of Religious (secular) Humanists. For purposes of the motion these allegations must be taken to be true, particularly in light of their particularity.